**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**JAHMAL HART, Defendant**

Criminal No. F286/2005

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

May 10, 2006

ERNEST F. BASON, ESQUIRE, Assistant Attorney General, Department of Justice, St. Thomas, Virgin Islands, *Attorney for the Plaintiff.*

STEPHEN BRUSCH, ESQUIRE, St. Thomas, Virgin Islands, *Attorney for Defendant.*

SWAN, *Judge*

## MEMORANDUM OPINION

(May 10, 2006)

Before the Court is Defendant's joint motion to suppress physical evidence, to suppress Defendant's statements made to the police during interrogation and to suppress the pretrial identification of Defendant. For the reasons enumerated below, Defendant's joint motion to suppress is DENIED.

## FACTS

Defendant is charged in a nineteen count information with several crimes, including two counts of first degree murder, two counts of felony murder, and four counts of first degree assault.

Essentially, from the paucity of information elicited from testimony and from documents presented at the suppression hearing, the operative facts are that the victims, Leon Roberts and Trustan Charlier, ("Decedents") two residents of New York, were on St. Thomas to attend a wedding. On the night of June 15th, 2005, both individuals were returning to their rooms at the Windward Passage Hotel (Holiday Inn) located on Veterans Drive. On the route to the Hotel, the Decedents arrived at a bus stop on Veterans Drive, which is located across the street from the Arturo Watlington Post Office at the entrance of Frenchtown. At that juncture, they encountered the Defendant and his younger brother, A.H., a minor. A dialogue ensued between the party of the Decedents and the party of Defendant and his brother. Defendant and his brother demanded money from the Decedents. When the Decedents refused to surrender their money, both were immediately shot and died the same night. The People ("Government") asserts [sic] that Defendant and his brother are the persons who discharged the firearms, which caused the Decedents' demise.

Approximately two weeks later, Defendant was taken into custody by the police and transported to the police station. While at the police station, Defendant was advised of his Constitutional Rights. He signed a July 1st, 2005 "warning as to rights" form, which is a waiver of his Fifth Amendment Right. Thereafter, Defendant proceeded to give a written statement to police concerning his whereabouts between the night of June 14th, 2005 and the early morning hours of June 15th, 2005. It is this written statement that Defendant seeks to suppress.

The Government asserts that it has an eyewitness to the killing, who had an unobstructed view of the entire shooting incident from its inception to the time of Defendant's hurried departure from the crime scene. The witness, however, is alleged to be a homeless person and a professed drug addict.

The same eyewitness asserts that he knows the Defendant, because he had previously purchased drugs from Defendant. Additionally, the eyewitness stated that he saw Defendant earlier on the night of the

shooting in Simmonds Alley, an area of lower Kronprindsens Gade, notoriously known as a place where drugs are sold. The eyewitness also stated that he saw Defendant and his brother in the general area of Frenchtown immediately prior to the shooting. The eyewitness further asserts that he is very certain of Defendant's identity, having previously seen Defendant at a local bar establishment commonly known as the "Fireman's Bar."

The same eyewitness stated to police what either Defendant or his brother said to the Decedents as they approached the Decedents, and what either Defendant or his brother said to the Decedents while simultaneously demanding the Decedents' money. The eyewitness also described how Defendant had an altercation with one of the Decedents and further detailed how the Decedents were shot. The Defendant likewise seeks to suppress the eyewitness's pretrial identification of him, as one of the Decedents' assailants.

## DISCUSSION

No physical evidence was retrieved from Defendant's person or possession. Therefore, there is no evidence to suppress. Two issues remain. First, whether prior to being interrogated by police, Defendant knowingly, intelligently, and voluntarily signed a written waiver, waiving his Fifth Amendment Constitutional Right. Second, whether the government's eyewitness made a non-suggestive and reliable out of court identification of Defendant.

After Defendant was taken to the police station, he was tendered a "warning as to rights" form, which he read and signed. A police officer asked Defendant if he understood what he read, and Defendant answered in the affirmative. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 26 L. Ed. 2d 694 (1966) requires that before questioning a suspect in custody, law enforcement officials must inform the suspect of the *Miranda* warnings. The *Miranda* Warnings encompass the suspect's right to remain silent, his right to consult with a lawyer prior to making a statement, and if the suspect cannot afford to retain a lawyer, that one will be appointed to represent him at no cost to the suspect. The suspect must also be informed that he has a right to have his lawyer present during questioning and when he makes a statement and that anything he says can subsequently be used against him in court. Interestingly, the *Miranda* warnings are only required when a suspect is both in custody

and subjected to state interrogation. *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990). By custody is meant the deprivation of "freedom of action in any significant way." 384 U.S. at 444. Custody means formal arrest or restraint on freedom of movement of the degree associated with formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983).

In determining whether an individual is in custody for purposes of the Miranda Warnings, the ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Reinert v. Larkins*, 379 F.3d 76, 86 (3d Cir. 2004). *See also United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004). Once a formal arrest occurred and the police endeavored to interrogate or question the Defendant concerning the crimes in this case, his right to receive the *Miranda* Warnings vested. *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995), *United States v. Teemer*, 394 F.3d 59, 66 (1st Cir. 2005), *cert. denied* 125 S. Ct. 1964 (2005).

Additionally, the Fifth Amendment right to counsel can only be invoked while a suspect is in custody. Similarily, in *United States v. LaGrone*, 43 F.3d 332 (7th Cir. 1994), the Court opined that Defendants cannot invoke their *Miranda* rights outside the context of custodial interrogation.

The Court finds that Defendant was in custody while he was at the police station. Defendant did not voluntarily enter the police station. To the contrary, after being arrested, Defendant was escorted by police officers to a police vehicle and transported to the police station. Certainly, Defendant was not voluntarily in the police vehicle. While in the police vehicle, the police officers exercised total dominion and control over him. Unquestionably, when a suspect is in a police vehicle at the behest of the police officers for the sole purpose of being transported to the police station for questioning, that suspect's freedom of movement has effectively been curtailed or ceased. In such instance, a reasonable person would have no hesitancy or compunction in concluding, under the totality of circumstances, that he is under arrest, is formally restrained, and is in custody. *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001), *United States v. Abdulla*, 294 F.3d 830, 834 (7th Cir. 2002) Therefore, in this case, the questioning initiated by the police constituted "custodial interrogation" which implicated Defendant's Fifth Amendment rights. *Murray v. Earle*, 405 F.3d 278, 286 (5th Cir. 2004);

411

*United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004); *Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir. 2005).

There is no evidence that Defendant does not understand English, the language in which the "warning as to right" form is written. Likewise, Defendant never expressly or inferentially informed the police that he does not speak English. Importantly, Defendant never requested of the police to explain to him the content of the "waiver as to right" form.

In *United States v. Mullin*, 178 F.3d 334 (5th Cir. 1994) *cert. denied*, 120 S. Ct. 454, 145 L. Ed. 2d 270 (1999), the Court held that a confession is "voluntary," if it is the product of the Defendant's free and rational choice, in the absence of official overreaching, either by direct coercion or subtle psychological persuasion. Whether a confession is voluntary is determined by considering the totality of the circumstances surrounding the confession. Also, while the ultimate test of admissibility of a confession is its voluntariness, there are many factors and circumstances that interact in enabling a court to reach that determination. *United States v. Mc Cullah*, 76 F.3d 1087 (10th Cir. 1996). In *United States v. Pierce*, 152 F.3d 808 (8th Cir. 1998), the Court opined that in considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence or promises, either expressed or implied, such that the Defendant's will was overborne and his capacity for self-determination was critically impaired. *See also, Dickerson v. United States*, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).

In *Coleman v. Singletary*, 30 F.3d 1420, 1426 (11th Cir. 1994), the Court found a confession of a 15 year old to be voluntary when he knowingly waived his *Miranda* Rights and where there was no evidence the Defendant had been threatened or intimidated. Additionally, a Defendant with an IQ of 70 was not per se incapable of waiving his *Miranda* Rights even though he was only 16 years of age. *United States v. Robinson*, 404 F.3d 850 (4th Cir. 2005). Also, in *United States v. Doe*, 155 F.3d 1070 (9th Cir. 1998), the Court opined that the juvenile's *Miranda* Waiver was knowingly and intelligently made, even though his parents were not present, when he was informed of his rights, and the juvenile was asked if he understood his rights, and said he did.

In *United Stated v. Garcia-Ley*, 39 Fed. Appx. 579 (9th Cir. 2002), the Court concluded that the Defendant's initialing and signing a written waiver form, containing the required *Miranda* Warnings, was sufficient

to establish that the Defendant understood his rights and knowingly and intelligently waived them, in light of the testimony of two government agents regarding the circumstances under which the waiver was obtained. Significantly, in *United States v. Amano*, 229 F.3d 801, 805 (9th Cir. 2000), the Court found a valid waiver when the Defendant signed a written waiver, and the *Miranda* Rights were read to the Defendant twice.

In this case, no evidence was adduced to remotely suggest that Defendant was threatened, coerced or intimidated or was physically and mentally abused by the police during his purported interrogation. The record is devoid of any suggestion that the police officers assumed a truculent posture at any time during the Defendant's interview, which resulted in his statement. No evidence was found that the detectives used words directed to Defendant from which one can conceivably conclude that Defendant's will was overborne before or during the taking of his statement. Additionally, there is no testimony or evidence that Defendant was physically restrained or prevented from using a phone at the police station to call a friend, a family member or a lawyer. Also, there is no evidence that at any time during the interview with police, Defendant was abused or subjected to compulsion by the police to make his statements. There was no testimony or its functional equivalent that the police officers menacingly or in any fashion exhibited, displayed or brandished their firearms, batons or police clubs in Defendant's presence to coerce him into making the statement Defendant signed. Similarly, there is no evidence that Defendant was held 'incommunicado' for countless hours or several, continuous days before his interview in which he signed his statement. No testimony was offered at the hearing from which one can conclude that the police officers' overt action or conduct, jointly or individually, constituted threats or coercion directed at Defendant. The Court's record is bereft of any evidence that the officers employed trickery or deception to surreptitiously procure Defendant's statements. No evidence was presented that the officers used hostile verbal pronouncements, while intimidating or coercing the Defendant into making or signing his written statement. Lastly, there was no evidence presented at the hearing from which an impartial observer can conclude that at the time Defendant made his statement, he was inebriated, under the influence of medication or drugs, or was otherwise not in full command of his mental faculties. Furthermore, no evidence

was introduced at the hearing that Defendant is afflicted with a mental illness or other comparable malady. In *United States v. Miguel*, 87 Fed. Appx. 67 (9th Cir. 2004), the Court found the Defendant's statements to police were voluntary and admissible in a murder prosecution, because Defendant was neither intoxicated nor impermissibly coerced by threat into making the inculpatory statement to investigators.

Considering the facts elicited at the suppression hearing, the Court concludes that no police misconduct occurred during the Defendant's interrogation. In *Elliot v. Williams*, 248 F.3d 1205, 1210-1214 (10th Cir. 2001), the Court concluded that the Defendant's confession was voluntary despite Defendant's intoxication with heroin, because there was no evidence of police misconduct. The Court further concludes that there was no police coercion perpetrated upon Defendant.

Also, in *United States v. Santos*, 131 F.3d 16, 19 (1st Cir. 1997), the Court opined that because there was no official coercion, the Defendant's confession was voluntary despite the Defendant's chronic paranoid schizophrenia. Similarly, appellate courts have concluded that a defendant's confession was voluntary, because there was no evidence of police coercion despite defendant's paranoia. *United States v. Lawal*, 231 F.3d 1045, 1048-1049 (7th Cir. 2000); *Henderson v. Norris*, 118 F.3d 1283, 1288 (8th Cir. 1997).

Importantly, while signing the "warning as to rights" form, Defendant never wrote on the form that he wanted or requested an attorney, and the police officers denied his request. Defendant never made any verbal utterances, pronouncements or demands, requesting an attorney or mentioning the word attorney. Therefore, the Court concludes that Defendant never requested an attorney before or during his interrogation by the police officers.

Significantly, appellate courts have held that a waiver of *Miranda* Rights must be unambiguous and unequivocal, in order to constitute a valid waiver, and mentioning the word "attorney" may not be a sufficient assertion of the Rights. For example, courts have held that there were no requests for a lawyer in several circumstances where the discussion only mentioned the word "lawyer." In *Meueller v. Angelone*, 181 F.3d 557, 573-74 (4th Cir. 1999), the Court found no clear invocation of right to counsel because defendant's question, "Do you think I need an attorney here?" was an ambiguous request for counsel. In *United States v. Walker*, 272 F.3d 407, 412-13 (7th Cir. 2001), the Court concluded that continued

questioning is permissible when the Defendant said he wasn't sure whether he should talk to an agent because he was afraid it would anger his lawyer, because the statement was not an unequivocal request for counsel. Also, in *Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir. 2001), the Court said there was no clear invocation of right to counsel because defendant's question, "Could I see a lawyer?" was an ambiguous request for counsel. See, also *United States v. Doe*, 60 F.3d 544, 546, (9th Cir. 1995), where the Court found no clear vocation of right to counsel when, after one hour of questioning, juvenile defendant's mother said, "[M]aybe he ought to see an attorney."

█ It is the government's burden to prove the voluntariness of a confession at least by a preponderance of the evidence. *Missouri v. Seibert*, 542 U.S. 600 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). The Court finds from the facts in this case that the Government has proved the voluntariness of Defendant's statement by a preponderance of the evidence. Therefore, the Court concludes that under the totality of circumstances, the Defendant voluntarily, intelligently, and knowingly waived his Fifth Amendment rights when he signed the "warning as to rights" form. Moreover, Defendant's statements were made freely and voluntarily without any compelling influence. Therefore, the statements are admissible as evidence in subsequent legal proceedings. *United States v. Lopez*, 380 F.3d 538, 546 (1st Cir. 2004), *cert. denied* 125 S. Ct. 924, 160 L. Ed. 2d 812, *rehearing denied,* 125 S. Ct. 1379, 161 L. Ed. 2d 169. Accordingly, Defendant's motion to suppress his statement to the police during his interrogation will be denied.

Defendant has challenged his pre-trial identification by the Government's eyewitness.

First, there is no evidence that the perpetrators of the crimes wore masks or other paraphernalia to conceal their faces or identity at the time of or during the shooting. Importantly, the Defendant and the eyewitness are not strangers to each other. Rather, the eyewitness had seen the Defendant before the day of the fatal shooting, and they did business with each other. He had encountered the Defendant on a prior occasion when the eyewitness and Defendant allegedly consummated a drug transaction in Simmonds Alley.

Second, the eyewitness had an unobstructed view of the perpetrators of the crimes during the entire shooting episode. Moreover, the eyewitness had already witnessed the encounter between the Defendant

and the Decedents immediately prior to the shooting, which afforded the eyewitness sufficient time to observe and to identify the Defendant.

Third, the eyewitness had previously seen the Defendant in the business establishment commonly referred to as "Fireman's Bar" located on lower Kronprindsens Gade.[1]

Fourth, at the time of the shooting, there was no other simultaneous occurrence in the surrounding area or in proximity of the shooting, which would have diverted the eyewitness's attention from the shooting. It must be reiterated and emphasized that the nature of the encounter between the Decedents and Defendant and what transpired during the encounter were what initially invited the eyewitness's attention to the Decedents, to the Defendant and to the Defendant's brother.

In *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), the High Court elucidated the factors to be considered in any instance of identification. The standard or approach is the totality of the circumstances. *Manson v. Brathwaite*, 432 U.S. 98, 114 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *United States v. Henderson*, 320 F.3d 92, 100-101 (1st Cir. 2003). The factors to be considered are 1) the eyewitness's opportunity to view the Defendant at the time of the crime; 2) the witness's degree of attention at the time of the crime 3) the accuracy of the witness's description of the Defendant prior to the identification; 4) the witness's level of certainty when identifying the Defendant at the confrontation and 5) the length of time that elapsed between the crime and the confrontation. See *Howard v. Bouchard*, 405 F.3d 459 (6th Cir. 2005); *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003) *cert. denied* 124 S. Ct. 812, 540 U.S. 1052, 157 L. Ed. 2d 704.

It is noteworthy that within approximately two weeks after the shooting, the eyewitness identified the Defendant, making the identification extremely reliable. There was no diminishment of the eyewitness's memory, during that two weeks period nor was evidence presented at the hearing to demonstrate or reflect such diminishment in the eyewitness's memory.

There is no evidence that the eyewitness was under the influence of drugs at the time of the shooting or that his ability to see was otherwise

---

[1] It is the Court's understanding that years ago, and under past ownership, the Bar was frequented by a large number of local firemen, which accounts for the name by which it was commonly known.

impaired. Importantly, there is no evidence to suggest that the eyewitness was not mentally lucid at the time of the shooting. A short time before the shooting, the eyewitness was searching for something to eat. He ate and was laying at the bus stop in preparation for a night's sleep. Considering that the shooting occurred late at night, it was not unusual for the eyewitness, who was homeless, to be laying down inside the structure constituting the bus stop, which afforded the eyewitness a measure of escape and refuge from the natural elements. Therefore, the eyewitness was not happenstancely at the bus stop.

In the eyewitness's statement, he asserts that he was not under the influence of drugs at the time of the shooting, because he had no money to purchase drugs.

█ The eyewitness had ample time to observe the Defendant and his brother during their encounter with the Decedents. He was in proximity to the scene and had an excellent vantage point to observe the Defendant who he knew exceptionally well. The eyewitness purportedly represented to Detective Mario Stout that he is one hundred percent certain about the Defendant's presence at the crime scene.

In *United States v. Burbridge*, 252 F.3d 775, 778 (5th Cir. 2001), the Court found the identification to be reliable because the witnesses viewed the robber without his mask from a few feet away for at least fifteen seconds. Additionally, in *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1050 (7th Cir. 2003), the Court found an identification to be reliable, because the witnesses had ample time to view the defendants during the robbery.

The shooting occurred on June 15th, 2005. The eyewitness's statement was given on June 29th or two weeks after the shooting. According to the transcript of the July 2nd, 2005 advise of rights hearing for Defendant, the eyewitness made his identification of Defendant on or before July 1st, 2005, when the eyewitness identified the Defendant in the area of Simmonds Alley. It was in his June 29th, 2005 statement that the eyewitness identified the Defendant as being involved in the shooting. (The Court takes judicial notice of the advise [sic] of rights hearing. See FED. R. EVID. 201.)

In *Levasseur v. Pepe*, 70 F.3d 187, 195 (1st Cir. 1995) the Court found identification six months after the crime to be reliable. See, *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1103 (6th Cir. 1990) (en banc), in which the Court concluded that an identification of less than one month was

417

reliable. In *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002), the Court concluded that an identification from a line-up only three weeks after the robbery when memory was still fresh was reliable. Therefore, the Court finds that the eyewitness' identification is reliable.

Accordingly, the unavoidable conclusion is that Defendant's motion to suppress the eyewitness's identification of Defendant must be **denied.**

The Court holds that when a Defendant is arrested and advised of his Miranda Rights and the Defendant thereafter signs a written waiver of his rights, but never requested a lawyer and there is no evidence of police coercion, threats or intimidation to procure the waiver nor is there any evidence that Defendant is suffering or experiencing any mental disability, temporarily or otherwise, the Defendant's waiver of his Constitutional Right is valid.

The Court further holds that when an eyewitness knows a suspect because of prior encounters with the suspect, and witnesses a crime in which the suspect allegedly participated but did not conceal his face during the crime, the eyewitness's pretrial identification of the suspect within two weeks after the crime will be regarded as reliable. An appropriate Order will be entered consistent with this memorandum opinion.